## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **EARLE A. PARTINGTON**<br>**1330 PACIFIC TOWER**<br>**1001 BISHOP STREET**<br>**HONOLULU, HI, 96813,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**VICE ADMIRAL JAMES W.**<br>**HOUCK, JAGC, USN**<br>**1322 PATTERSON AVE. SUITE 3000**<br>**WASHINGTON NAVY YARD, D.C. 20374,**<br><br>    **and**<br><br>**CAPTAIN ROBERT A.**<br>**PORZEINSKI, JAGC, USN**<br>**1322 PATTERSON AVE. SUITE 3000**<br>**WASHINGTON NAVY YARD, D.C. 20374,**<br><br>    **and**<br><br>**CAPTAIN ROBERT B.**<br>**BLAZEWICK, JAG, USN**<br>**REGIONAL LEGAL SERVICE OFFICE**<br>**850 WILLAMETTE ST.**<br>**PEARL HARBOR, HI 96860,**<br><br>    **and**<br><br>**CAPTAIN C. N. MORIN, JAGC, USN**<br>**1322 PATTERSON AVE. SUITE 3000**<br>**WASHINGTON NAVY YARD, D.C. 20374,**<br><br>    **and**<br><br>**UNITED STATES COURT OF APPEALS**<br>**FOR THE ARMED FORCES**<br>**450 E. STREET N.W.**<br>**WASHINGTON, DC 20442,**<br><br>    **Defendants.** | **Civil Action No.:** |

**COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF**

## I. INTRODUCTION

By this action, attorney Earle A. Partington ("Partington") seeks, *inter alia*, the review of a decision by the Judge Advocate General of the United States Navy ("NJAG") purporting to suspend him from the practice of law in any and all proceedings conducted under the auspices of the NJAG (i.e., those involving Navy and Marine Corps personnel).  This decision was based upon a recommendation made by the Commanding Officer of the Navy's Trial Service Office, Pearl Harbor, Hawaii, following an "ethics investigation" conducted against Partington. Throughout the course of this so-called investigation, which was undertaken without statutory authority, the defendants violated the NJAG's internal procedures and Partington was denied his due process right to adequately defend himself against amorphous and clearly retaliatory "charges".

More disturbingly, there appears to have been an overarching plan by the NJAG to intimidate and pressure Partington, and other civilian and perhaps detailed military defense counsel, to refrain from zealously, professionally, and effectively delivering to their clients competent legal counsel which comports with and protects vital constitutional rights.  In essence, the NJAG's effort to silence Partington via a sham "ethics investigation" is intended to, and most emphatically does create an atmosphere of intimidation and fear, especially among civilian defense counsel, who pursue a vigorous defense of their clients in court-martial proceedings. These improper actions have violated Partington's rights under, *inter alia*, the 5th Amendment to the United States Constitution and have damaged him significantly.  As a direct result of the improper action taken against Partington by the NJAG, the United States Court of Appeals for

the Armed Forces ("CAAF") suspended Partington from practice before that court for one year. Partington, therefore, seeks injunctive relief prohibiting either NJAG and/or CAAF from preventing him from representing clients in those forums *pendente lite*.

## II. PARTIES, JURISDICTION, AND VENUE

1.  Partington is an attorney with over forty-one years of experience who is licensed to practice in Hawaii, California, the Northern Mariana Islands, Oregon (inactive), the District of Columbia (inactive), Zimbabwe, and multiple federal courts including CAAF.   Partington's principal place of residence is Honolulu, Hawaii.

2.  Defendant Vice Admiral James W. Houck, JAGC, USN, was at all relevant times on active duty with United States Navy and was the Judge Advocate General of the United States Navy, stationed in Washington, D.C.  He is being sued in his personal capacity and in his official capacity as Judge Advocate General.

3. Defendant Captain Robert Porzeinski, JAGC, USN, was at all relevant times on active duty with United States Navy and served in the NJAG, stationed in Washington, D.C. He is being sued in his personal capacity.

4.  Defendant Captain Robert Blazewick, JAGC, USN, was at all relevant times on active duty with the United States Navy and served as the Commanding Officer of the Navy Trial Service Office, based at Pearl Harbor, Hawaii. He is being sued in his personal capacity

5. Defendant Captain C. N. Morin, JAGC, USN, was at all relevant times on active duty with the United States Navy and served as the NJAG Navy Rules Counsel in Washington, D.C. He is being sued in his personal capacity

6. The United States Court of Appeals for the Armed Forces ("CAAF") is an Article I court with jurisdiction to hear appeals from the service courts of criminal appeals.  It is located at 450 E. Street N.W., Washington, D.C., 20442.

7. Jurisdiction obtains pursuant to 28 U.S.C. § 1331, as federal questions are raised in the instant litigation.  Jurisdiction also obtains pursuant to the Administrative Procedures Act, 5 U.S.C. §702.

8. Venue obtains pursuant to *inter alia* 28 U.S.C. §1391(e).

### III. FACTUAL ALLEGATIONS

#### Partington Zealously and Ethically Protects His Client's Interests

9. On or about April 29, 2006, Partington entered an appearance as civilian defense counsel on behalf of AM1 Stewart Toles, II, U.S.N. ("Toles" or "the Accused"), in a Navy general court-martial conducted at Pearl Harbor on April 18, May 18, June 26, and July 24-26, 2006.  Toles also was represented by detailed military defense counsel, Lieutenant Karl H. Meuller, JAGC, USNR, and assistant defense counsel, Lieutenant Anita Scott, JAG, USCG.

10. During the course of representing Toles, civilian and detailed military defense counsel became aware of a possible jurisdictional defect relative to certain of the charges and specifications against Toles.  Specifically, Partington noted that the charges and specifications filed in connection with the federal "video voyeurism" statute, 18 U.S.C. §1801, failed to allege that the offenses took place within the "special maritime and territorial jurisdiction" of the United States, a requirement of the statute.

11. On information and belief, Toles was one of the first members of the United States Navy to be prosecuted by the Navy for violating the "video voyeurism" statute.

12.   Acting in what they believed in good faith to be in the best interests of his client, on July 24, 2006, Toles defense counsel allowed him to plead guilty, pursuant to a pre-trial agreement, to the charges and specifications against him, including twenty specifications of violations of the "video voyeurism" statute and one specification of an attempted violation.  All defense counsel herein had discussed this course of action and concurred in this approach.

13.   After the military judge accepted Toles' plea, he entered findings of not guilty as to the "video voyeurism" charges and specifications.

14.   At no time did the government move to set aside, nor did the military judge set aside, the military judge's findings of not guilty as to the "video voyeurism" charges and specifications.

15. After the pleas had been accepted by the military judge, Partington orally sought their dismissal, citing the possible jurisdictional defect.  At all relevant times, Toles remained in compliance with the pre-trial agreement.

16.   To represent Toles' best interests, all defense counsel were legally, professionally and ethically obligated not to reveal the possible jurisdictional defect to the government prosecutor ("trial counsel") or to the military judge prior to that time.  Instead, they were duty-bound to the client to take advantage of the possible charging error at a time and in a manner that, they believed, would preclude the government from amending the charges to cure the defect.  Civilian and military defense counsel and assistant counsel discussed this approach and concurred in it.

17.   The defense motion caused a great deal of consternation among trial counsel and the presiding military judge.  Over the course of the next two days, there was much discussion among defense counsel, trial counsel and the military judge as to the effect, as well as the propriety, of Partington's motion.

18.  The trial record reflects the confusion among the various participants regarding how to proceed.  Indeed, as Partington himself was unsure of the effect that the possible jurisdictional defect would have upon the validity of the charges, defense counsel prepared a memorandum of points and authorities for the military judge's consideration.  As a result, the record of these proceedings is itself confusing.

19. On at least two occasions during the course of this exchange, the military judge stated that he was entering findings of not guilty, as opposed to simply entering not guilty pleas on Toles' behalf with respect to the "video voyeurism" charges and specifications.

20.  Ultimately, as to the "video voyeurism" charges and specifications, Toles pleaded guilty to lesser included offenses of disorderly conduct and, in connection therewith, the military judge did, in fact, find that Toles was not guilty of the "video voyeurism" counts.

21.  As a result of Partington's motion, Toles' maximum potential confinement was reduced from sixty-three (63) years and four (4) months to forty-eight (48) years and ten (10) months.

22.  Thereafter, the military judge conducted an extensive sentencing hearing at which the trial counsel presented six witnesses, all of whom addressed the conduct of the accused as it related to the "video voyeurism" charges and specifications, now reduced to disorderly conduct charges and specifications.

23.  At the conclusion of the hearing, at which the government sought a sentence of fifteen years confinement, and Partington argued for a maximum sentence of five years, the military judge sentenced Toles to, *inter alia*, five years confinement.

### Partington Represents Toles on Appeal

24.   Partington subsequently was retained by Toles to represent him on the automatic appeal of his court-martial conviction, filing a brief (the "Brief") with the United States Navy-Marine Court of Criminal Appeals ("NMCCA") on or about March 23, 2007.  Lieutenant Brian Mizer, JACG, USN was detailed appellate defense counsel and filed the Brief on Toles' behalf with the NMCCA in Washington, D.C.

25.   Among the arguments raised in Toles' appeal was that, subsequent to his pleading guilty to the "video voyeurism" counts, the military judge had ruled, in effect, that because of the possible jurisdictional defect noted by defense counsel, the "video voyeurism" charges and specifications failed to state these offenses.

26.   As a matter of law, an acquittal not on the merits, such as was the case here, constitutes a dismissal of the charges and specifications in question.

27.   The defense argued that the military judge's action, by operation of law, constituted a dismissal of the "video voyeurism" charges and specifications in their entirety.  Accordingly, it was argued that it was impermissible for the military judge to have accepted Toles' pleas to the lesser included offense of disorderly conduct because the primary charges and specifications of "video voyeurism" already had been dismissed.

28. The government responded that the military judge did not rule on the merits of Toles' motion to dismiss and did not, in fact, dismiss the "video voyeurism" counts.

29.   Significantly, the government did not allege in its brief that Partington or any other of Toles' defense counsel had deliberately misconstrued the record or had even made any misrepresentations of fact or law.

30.  No oral argument was heard on the case.  This deprived both the defense and the NMCCA of the opportunity to address and correct any confusion over Partington's arguments and use of terms "acquittal" or "dismissed."

### The NMCAA Opinion Seeks to Shift Blame onto Partington for the Navy's Mistake

31.  The NMCCA issued its decision on October 30, 2007.

32.  While it ultimately upheld Toles' conviction and sentence, it took issue with defense trial tactics, which it described as "unsavory" with respect only to Partington.

33.  A fair reading of the NMCCA's opinion reveals that its concern over the defense's tactical decision not to inform the government or military judge of the possible jurisdictional defect until after the guilty pleas had been accepted had undoubtedly colored the court's reading of the Brief.

34.  Legal arguments and statements made by Partington, which were made in good faith and without prejudice to the government, were, without serious consideration, viewed by the NMCCA as deliberate "misrepresentations" of fact and attempts to distort the record.

35.  For example, the NMCCA opinion mocked Partington's use of quotation marks around the term "acquitted," gratuitously stating that he did so "apparently to shield himself from accepting responsibility for using it."  In fact, Partington not only devoted nearly a page of his brief to demonstrate why he used the term "acquitted," quotation marks and all, but also cited to relevant United States Supreme Court authority to support his argument.

36.  Because the NMCCA was concerned with what it believed were the defense's "unsavory tactics", again attributed solely to Partington, it *sua sponte* referred its opinion to the NJAG and the Navy's Rules Counsel ("Rules Counsel") for review.  This was done despite the

NMCCA having found both that the defense was not ineffective and that Toles has suffered no prejudice as a result of his actions.

37.   The NMCCA opinion is silent as to the fact that neither the military judge, nor military trial counsel, nor the military defense counsel, nor the assistant military trial defense counsel, nor detailed appellate military defense counsel, nor the government appellate counsel in its brief, had claimed at any point in the proceedings that Partington had misrepresented any fact or law or engaged in professional misconduct.

38.   Had any of those individuals believed that Partington had, in fact, engaged in such conduct, under applicable Navy regulations, they would have been required to report such a violation.  If Partington actually engaged in misconduct, their failure to report it would, itself, constitute professional misconduct by them.  Yet, no such misconduct was alleged.

39.   Due to an "administrative oversight," the NMCCA opinion was not forwarded to the NJAG until September 22, 2008, nearly one year later.

40.   In the cover letter accompanying the opinion, the clerk of the court stated that the opinion was being forwarded for "review and appropriate action."  Nowhere in either the NMCCA opinion, nor the transmittal letter to the NJAG, was the NMCCA opinion referred to as a "complaint" against Partington (or any of the detailed military defense counsel).

### An "Inquiry" Begins Contrary to Appropriate Rules

41.   On or about October 10, 2008, the Rules Counsel of the NJAG notified Partington that it had commenced a preliminary inquiry against him to determine if he had committed any violations of the NJAG Rules of Professional Conduct.  The Rules Counsel purportedly based its authority to conduct such an inquiry on JAG Instruction ("JAGINST") 5803.1C (Professional

Conduct of Attorneys Practicing Under the Cognizance and Supervision of the Judge Advocate General).

42. In its letter of October 10, 2008, the Rules Counsel stated that the NMCCA's October 30, 2007, decision constituted a "Complaint" from the NMCCA.  In so doing, the Rules Counsel violated JAGINST 5803.1C as follows:

> a)  Per JAGINST 5803.1C, the NMCCA Opinion would have constituted an informal complaint, which, in and of itself, could not have been cognizable for action, pursuant to JAGINST 5803.1C.

> b)  Per JAGINST 5803.1C, a formal complaint should have been presented to the Rules Counsel prior to the commencement of a preliminary inquiry.  Any formal complaint needs to meet the following requirements:

> (1)   be in writing and signed by the complainant;

> (2)   state that the complainant has personal knowledge or otherwise received reliable information indicating that:

(a) the covered attorney is, or has been, engaged in misconduct that demonstrates a lack of integrity, that constitutes a violation of these Rules or the Code of Judicial Conduct or a failure to meet the ethical standards of the profession; or

(b) the covered attorney concerned is ethically, professionally, or morally unqualified to perform his or her duties; and

(c) per JAGINST 5803.1C, "Complaints that do not comply with the requirements [of Paragraph 4 'The Formal Complaint'] may be returned to the complainant for correction or completion and resubmitted."

(3)     contain a complete factual statement of the acts or omissions constituting the substance of the complaint, as well as a description of any attempted resolution with the covered attorney concerned.  Supporting statements, if any, should be attached to the complaint.

43.  On information and belief, no effort was made to inquire of the NMCCA if it wished to file a formal complaint against Partington pursuant to JAGINST 5803.1C.

44.  In further violation of the procedure mandated by JAGINST 5803.1C, Partington was never provided a copy of a formal complaint.  Therefore, from the outset, he was denied his due process right to be made aware of the specific allegations made against him.  In fact, he was at a disadvantage throughout the investigative process in terms of trying to glean the exact nature of his alleged wrongdoing so that he could properly respond to it.

45.  Partington responded to the initial inquiry of the Rules Counsel with a letter, attached as Exhibit C, dated October 26, 2008, which, reflected Partington's view of the record and the arguments contained in the Brief, as well as his frustrations at having to respond to the amorphous allegations made against him by the NMCCA.

### The "Inquiry" Turns Vindictive

46.  On or about June 19, 2009, defendant Morin as the officer in charge of the Rules Counsel, without ever having received a formal complaint, and in violation of JAGINST 5803.1C, appointed defendant Porzeinski, to conduct the Preliminary Inquiry as to whether Partington violated Rule 3.3 of The Model Rules of Professional Conduct ("Rule 3.3").  The directive to "obtain sworn affidavits or statements from all material witnesses" was specific in defendant Morin's instructions to defendant Porzeinski.

47.  The vindictive nature of this inquiry is illustrated by the fact that defendant Porzeinski also was directed to examine certain of Partington's statements made in his October

26, 2008, response wherein he defended, not his Brief, which was the purported basis of the "complaint," but the ethical nature of his trial tactics.  Accordingly, it appears that the true nature of the inquiry was to punish Partington for his use of legitimate trial tactics which took proper advantage of the government's drafting mistake and, thereby, embarrassed the government.

48. The retaliatory, vindictive nature of this inquiry is further illustrated by the fact that none of the detailed trial military defense attorneys were the subject of any such inquiry or charges, despite the fact that they were part of the team that formulated and implemented the trial and appellate strategy. As such, they also should have been subject to a disciplinary inquiry, either for engaging in and joining Partington's alleged misconduct themselves, or for failing to report same.

49. On or about July 1, 2009, Partington, having never received a formal complaint, wrote to defendant Porzeinski to determine specifically how he was alleged to have violated Rule 3.3.  He requested, "something in the nature of a 'charge sheet,'" so that he could properly address the allegations against him.

50.  On or about July 30, 2009, defendant Porzeinski denied Partington's request for a charge sheet.

51.  On or about August 10, 2009, Partington, again, attempted to respond to the as yet unspecified allegations against him.  Significantly, to the extent the allegations against him could be gleaned from the NMCCA opinion, all of the statements at issue came from the Argument section of the Brief.

52.  On or about October 6, 2009, the Rules Counsel, having never received a formal complaint, and after having denied Partington a meaningful opportunity to respond to specific allegations of wrongdoing, converted the preliminary inquiry into a formal ethics investigation of

Partington.  On information and belief, defendant Porzeinski never attempted to contact, let alone take statements from, any of the parties involved in Toles' trial or appeal.

53. On or about October 6, 2009, defendant Morin, having known or should have known that the preliminary investigation was procedurally defective, instituted an ethics investigation against Partington, to be headed by defendant Blazewick.

54.  On information and belief, at that time, defendant Blazewick was the Commanding Officer of the Navy Trial Service Office, Pearl Harbor, Hawaii. The Navy Trial Service Office has supervisory authority over all NJAG trial counsel in Navy Region, Hawaii.  Thus, the appointment of defendant Blazewick to investigate a civilian defense attorney presented a clear conflict of interest.

55. On or about October 29, 2009, Partington wrote to defendant Morin and explicitly stated that he had never seen a formal complaint that had been issued against him (as required by JAGINST 5803.1C).  In addition, he questioned what authority the NJAG had to discipline him as he was not a member of the Naval Service, and pointing out that, as a civilian defense counsel, the proper procedure for the NJAG to pursue against him for a purported ethical violation would be to refer to him to the Office of Disciplinary Counsel of the Supreme Court of Hawaii, a copy of this letter is attached as Exhibit D.

**The Unauthorized Ethics Investigation – Based on Amorphous Charges – Proceeds**

56. On or about October 30, 2009, defendant Blazewick wrote to Partington and stated, that the JAG's authority to regulate and investigate his conducted was based, on, *inter alia*, UCMJ Article 27(b), 10 U.S.C. §827 ("Article 27(b))".

57. By its terms, Article 27(b) refers only to military counsel, not to civilian defense counsel.  Thus, it cannot serve as the basis for any regulation or instruction that purports to give

the NJAG the jurisdiction to regulate the conduct of civilian defense attorneys before Navy courts-martial.

58.  Pursuant to its notification of Partington to the ethics investigation against him, the Rules Counsel provided Partington, for the first time, with a list of violations of Rule 3.3 which he was alleged to have committed, as set forth in fourteen different specifications.

59.  Specifications 1, 2, 3, 4, 5, 6, 7, and 8 allege that Partington violated Rule 3.3 by knowingly making false statements.  The common putative factual falsehoods are Partington's assertion in the Brief that the military judge had dismissed the "video voyeurism" charges and specifications.

60.  Specifically, the specifications allege that the following statement, taken directly from the Brief, was false: Specification 1: "Toles had moved for neither an acquittal nor a dismissal of these specifications."

61.  The above-referenced statement was taken out of context and, albeit inaccurate, was not inaccurate for the reason stated by defendant Blazewick in his findings.  However, it was not made with the knowledge that it was "false."  The inaccuracy was, in fact, an editing error and the statement in question was not intended to go at the end of the paragraph in which it appeared.

62.  Any inaccuracies in the Brief were not material to any issue on appeal.

63.  Specification 2 provides: "(t)he military judge dismissed specification 2-7, 9-21, and 23 of charge IV ["video voyeurism"]…"

64. The above-referenced statement is not a statement of fact but is legal argument.  As a matter of law, such statement cannot be true or false.

65.  Specification 3 provides: "the military judge dismissed those specifications for failure to allege an offense… The issue presented is what is the effect of that dismissal."

66. The above-referenced statement is not a statement of fact but is legal argument.  As a matter of law, such statement cannot be true or false.

67. Specification 4 provides: "at no time did the government request reconsideration of the dismissals of the "video voyeurism" specifications nor did the military judge give notice to any party that he was reconsidering his dismissals."

68. The above-referenced statement, to the extent that it alleges the actions of the trial counsel and the military judge, is true.  To the extent that it states that the military judge dismissed the "video voyeurism" charges and specifications, it is legal argument.  As a matter of law, this statement cannot be true or false.

69. Specification 5 provides: "If the military judge intended to accept Toles' pleas to disorderly conduct under these specifications, he should not have dismissed them."

70. The above-referenced statement is not a statement of fact but is legal argument.  As a matter of law, this statement cannot be true or false.

71. Specification 6 provides: "Further, the court [sic] should have objected to the dismissals if it wanted to proceed on included offenses, but it did not.  The findings as to these specifications must be set aside and the government's failure to object to the dismissals was a waiver of any right to proceed further on them."

72. The above-referenced statements are not statements of fact but consist of legal argument.  As a matter of law, these statements cannot be true or false.

73. Specification 7 provides: "the charged offenses for these specifications were dismissed."

74. The above-referenced statement is not statement of fact but is legal argument.  As a matter of law, this statement cannot be true or false.

75.   Specification 8 provides: "The convening authority's action should have identified the included offense for each specification as disorderly conduct… instead of quoting the original specifications… which had been dismissed."

76.   The above-referenced statement is not a statement of fact but is legal argument.  As a matter of law, this statement cannot be true or false.

77.   Specifications 9, 10, 11, and 12 also allege that Partington violated Rule 3.3 by knowingly making false statements of fact.  The common falsehood alleged among them is Partington's assertion in the Brief that the military judge had "acquitted" the accused of the "video voyeurism".  Specifically, the specifications allege that the following statements, all taken directly from the Brief, were false:

78.   Specification 9 provides: "As to the 'video voyeurism' specification of charge IV to which Toles pled guilty, the military judge only accepted Toles' guilty pleas to the included offenses of disorderly conduct under UCMJ Art. 134, 'acquitting' him of the charged offenses of 'video voyeurism.'"

79.   The above-referenced statement, to the extent that it alleges the actions of the military judge, is true.  To the extent that it states that the military judge "acquitted" Toles, it is legal argument.  As a matter of law, this statement cannot be true or false.

80.   Specification 10 provides: "The military judge then 'acquitted' Toles of these specifications because they did not allege the charged offenses of "video voyeurism" (record at 278)."

81.   The above-referenced statement is not a statement of fact but is legal argument.  As a matter of law, this statement cannot be true or false.

82.  Specification 11 provides: "The military judge then ruled that he had 'acquitted' Toles of these specifications."

83.  The above-referenced statement is not a statement of fact but is legal argument. As a matter of law, this statement cannot be true or false.

84.  Specification 12 provides: "[t]he military judge's acquittal was not an acquittal for double jeopardy purposes."

85.  The above-referenced statement is not a statement of fact but is legal argument.  As a matter of law, this statement cannot be true or false.

86.  Specification 13 alleges that Partington violated Rule 3.3 in that the defense's assertion in the Brief that the military judge had dismissed the "video voyeurism" specifications for failure to state an offense was also allegedly false.  Specifically, it provides: "The military judge, after Toles had entered his guilty pleas and had them accepted, ruled that the "video voyeurism" specifications (specifications 2 through 23 of Charge IV) did not allege that offense because of the failure of the government to allege that the offense had been committed in the special maritime and territorial jurisdiction of the United States, an element of 18 U.S.C. §1801."

87. The above-referenced statement in specification 13 is not a statement of fact but is legal argument.  As a matter of law, this statement cannot be true or false.

88.  The final specification against Partington alleges a violation of Rule 3.1 based upon Partington having asserted issues in the Brief that he knew were not true or meritorious: namely, his assertions identified in the first twelve specifications against him.

89.  Significantly, each specification cited against Partington came from the Argument section of the Brief and concerned his legal argument that the military judge had *de jure* dismissed the "video voyeurism" charges and specifications.  Even a cursory reading of the

alleged false statements reveals that all but one of them are points of argument, not factual statements.

90.  The specifications set forth against Partington went well beyond four statements identified by the NMCCA in its opinion.  More fundamentally, none of the specifications alleged against Partington stated in any manner how they were false (or, as to each specification, what the 'true" statement should be).

91.  Inasmuch as the statements were made in the context of legal argument, a failure on the part of the NJAG to specify how they were false, or could be false, or, alternatively, what the objective "truth" was, rendered it impossible for Partington to provide a meaningful response.

92.  Despite repeated, written requests, attached as Exhibits E through M from Partington to obtain such information, defendant Blazewick steadfastly refused to provide it.

93. At no point in defendant Blazewick' s October 30, 2009, letter to Partington, nor in any subsequent correspondence, did defendant Blazewick inform Partington that the outcome of the ethics investigation could result in the NJAG taking disciplinary action against Partington.

94.  Out of frustration at his inability to obtain the information he needed to defend himself, Partington ultimately refused to cooperate further with the investigation and so notified defendant Blazewick in writing.

95.  On or about February 22, 2010, defendant Blazewick completed his investigation. On information and belief, despite having the authority to do so, defendant Blazewick did not interview any of the participants in Toles' trial, nor the members of the appellate panel of the NMCCA that heard Toles' appeal.  Significantly, on information and belief, he did not interview any of the detailed military defense attorneys who served with Partington and again, who were

integrally involved in either the formulation and implementation of the alleged unethical strategy or in simply identifying and reporting any alleged impropriety to the proper authority.

96.  Defendant Blazewick found each of these purported statements of fact to be false and that Partington had made them knowing they were false statements of fact.

97.  On information and belief, no investigation was undertaken as to the apparent "failure" of the trial counsel, the detailed military defense counsel, the military judge, or government appellate counsel, to report any alleged ethics violation or misconduct committed by Partington, as they would have been required to do, should same exist, pursuant to JAGINST 5803.1C.

98.  It is clear from the "Opinion" portion defendant Blazewick's memorandum to the Rules Counsel, dated February 19, 2010, which reported the results of his ethics investigation, that the Navy's distaste for Partington's trial tactics combined with its irritation over Partington's refusal to accept the denial of his due process rights and to meekly cooperate with its investigation, formed the prism through which all of Partington's appellate arguments were viewed.  Not only were they taken out of the context of the entire record, but whenever possible, his statements were viewed as intentionally false and misleading when there was no objective evidence to support such an interpretation.

99.  While Partington may have  grown increasingly frustrated with the process and ultimately refused to cooperate further, the fundamental facts remained that: 1) Partington and his military co-counsel engaged in trial tactics that, while well within the bounds of ethical and zealous legal representation, were viewed by certain members of the NJAG, the NMCCA panel, and the Rules Counsel as "unsavory"; 2) Partington and military co-counsel submitted an appellate brief which reflected their legal interpretation of the facts on the record, which they

were not offered an opportunity to explain and/or clarify through oral argument; and 3) they were afforded no objective measure by which they (or any reviewing authority) could evaluate allegedly "false" statements to determine if they were, in fact, objectively truthful and accurate, or simply legal argument and opinion based on good faith recollection of the record.

100. The Navy never alleged nor proved that the so-called false statements were material to any of the issues on appeal.

101. Neither the UCMJ, nor any other statute, provides the NJAG with statutory authority to discipline Partington, thus rendering JAGINST 5803.C1 without a legal basis to authorize such action against Partington.

102. Neither JAGINST 5803.C1, nor any other regulation, specifies what presumptions apply during the course either of the preliminary inquiry or the ethics investigation. No presumptions were applied and therefore, Partington was denied the presumption of innocence as to any claims of professional misconduct.

103. Neither JAGINST 5803.C1, nor any other regulation, specifies the burden of proof to be applied during the course either of the preliminary inquiry or the ethics investigation. Therefore, Partington was unable to fashion an adequate response, as he could not know what level of response would be required to rebut the specifications.

104. Neither JAGINST 5803.C1, nor any other regulation, specifies the standard of proof to be applied during the course of either the preliminary inquiry or the ethics investigation.

105. Neither JAGINST 5803.C1, nor any other regulation, specifies that the subject of the inquiry be given notice that the proceeding is disciplinary.

106. Neither AGINST 5803.C1, nor any other regulation, makes a provision for anyone to serve as an adversary or otherwise provide the prosecutorial function during the course of the

"ethics investigation." Therefore, the hearing officer, in this case defendant Blazewick, was not a neutral arbiter, but was, in fact, prosecutor and judge.

107.  Neither JAGINST 5803.C1, nor any other regulation, makes any provision for an appeal or judicial review either of the findings of the "ethics investigation" or the discipline taken by the NJAG.

108.  Neither JAGINST 5803.C1, nor any other regulation, has any specified procedure for the hearing in the ethics investigation.

109. The NJAG violated the procedures set forth in JAGINST 5803.C1 in violation of Partington's due process rights and to his detriment.

## Partington's Ability to Represent Clients is Impaired

110.  Ultimately, the ethics investigation determined that Partington violated Rules 3.1 and 3.3. It further recommended that: 1) the ethics investigation report be forwarded to the NJAG for further action; 2) Partington be indefinitely suspended from practicing law in any criminal or civil proceeding under the cognizance of the NJAG, and prohibited from practicing law in any area in the Department of the Navy under the cognizance of the NJAG; and 3) that the determination of the NJAG, if adverse, be reported to the Judge Advocate General of the Army to determine whether Partington should be decertified under Article 27 (b), UCMJ.

111.  Partington not only was purportedly suspended from practicing law in any proceeding under the cognizance of the NJAG, but that purported suspension was the sole basis for the CAAF to discipline him, without a hearing, by ordering a one year suspension of practice before it.  Partington had requested a hearing from CAAF.

112.   As cases involving the military constitute a significant part of Partington's legal practice, the NJAG and CAAF suspensions deprive him of his livelihood and professional reputation.   Additionally, they impair the ability of Navy and Marine Corp. personnel to retain Partington as their counsel of choice.  Moreover, this purported suspension will have an *in terrorem* effect on other lawyers, civilian and military, who may seek to uphold and protect the rights of military personnel in a zealous and aggressive manner.   Concomitantly, the suspensions are an attack on Article 27(b) if the Uniform Code of Military Justice, imposing additional and unwarranted restraints on legal counsel.

## IV. <u>CLAIMS FOR RELIEF</u>

### <u>First Cause of Action</u>
### <u>Lack of Statutory Authority</u>
**(Defendant Houck, in his capacity as Navy Judge Advocate General and the United States Court of the Appeal for the Armed Forces)**

113.   Partington reavers and reasserts the allegations in paragraphs 1-112 as if fully set forth herein.

114.   In issuing a purported "suspension" of Partington, defendant Houck based his authority to undertake such disciplinary action, *inter alia,* on UCMJ Article 6, 10 U.S.C. §806, ("Article 6") and Article 27(b), 10 U.S.C. §827 ("Article 27(b)").

115.   Article 6 makes no mention, express or implied, concerning civilian defense counsel.  It's primary focus is on the appointment of judge advocates for the various branches of the armed forces.

116.  By its terms, Article 27(b) refers to "detailed" counsel, i.e. military personnel, not civilian attorneys.  Thus, the certification of competence by the NJAG in Article 27(b)(2) refers to the NJAG's certification of military attorneys detailed to represent the accused, not civilian attorneys retained by the accused.

117.  The NJAG had no statutory authority, pursuant to the UCMJ or any other statute, to discipline Partington.

118.  The NJAG had no statutory authority, pursuant to the UCMJ or any other statute, to issue rules and/or regulations that provide for the imposition of discipline on civilian defense counsel.

WHEREFORE Plaintiff Earle A. Partington respectfully requests that the Court enter a judgment in Partington's favor and against Houck in his capacity as Judge Advocate General and that the judgment provide the following relief:

a. a declaration that the purported suspension of Partington by NJAG is null and void;

b. a declaration that the suspension of Partington by CAAF is null and void;

c. a mandatory injunction entered directing the NJAG to set aside his purported suspension of Partington;

d. a mandatory injunction entered directing the CAAF to set aside its suspension of Partington;

e. an injunction entered prohibiting the NJAG from taking further action against Partington;

f. a writ in the nature of mandamus be issued directing that the NJAG set aside his purported suspension of Partington;

g. awarding Partington his fees, costs and expenses, including reasonable attorneys' fees, relative to the vindication of his rights by the above-captioned action pursuant to, *inter alia*, the Equal Access to Justice Act, 28 U.S.C. §2412; and

h. providing such other and further relief as is necessary and just.

**Second Cause of Action**
**Violation of Fifth Amendment - Procedural Due Process**
**and Loss of Liberty Interest**
**(Defendant Houck, in his capacity as Navy Judge Advocate General and the United States**
**Court of the Appeal for the Armed Forces)**

119.  Partington reavers and reasserts the allegations in paragraphs 1-118 as if fully set forth herein.

120.  The Fifth Amendment to the United States Constitution provides that "no person shall … be deprived of life, liberty or property without due process of law."

121.  Procedural due process requires, at minimum, a meaningful opportunity to be heard within a process of reasoned decision-making.

122.  Procedural due process also requires a meaningful notice of a specific reason why a person is being denied a potential liberty interest.

123.  Procedural due process further requires an opportunity to correct mistakes, to review or appeal an adverse decision in a fair and impartial manner, as well as fair notice of such an opportunity.

124.  The NJAG's actions against Partington as described in the instant complaint not only have deprived Partington of a liberty interest but have done so without allowing him adequate opportunity to defend himself.

125.  The hearing and investigation against Partington were violative of his constitutional rights for, without limitation, the following reasons:

a)  the NJAG lacks statutory authority to conduct an administrative (not a disciplinary) proceeding against a civilian attorney;

b)  the specifications against Partington failed to allege how the allegedly false and misleading statements made by Partington were, in fact, false and misleading, i.e. what the objective truth was with regard to each specification;

c)  Partington was not afforded notice that the ethics investigation could result in disciplinary action being taken against him by the NJAG;

d)  the procedure set forth in JAGINST 5803.C1 fails to provide the subject of the investigation with a presumption of innocence, or any other presumption;

e) the procedure set forth in JAGINST 5803.C1 fails to set forth a standard of proof to be established;

f)  the procedure set forth in JAGINST 5803.C1 fails to set forth a burden of proof to be established;

g)  the procedure set forth in JAGINST 5803.C1 fails to provide for an adversarial proceeding, impermissibly rendering the fact-finder the prosecutor;

h)  the procedure set forth in JAGINST 5803.C1 fails to provide any right of appeal to or review by a court or tribunal; and

i) civilian attorney discipline and regulation is a function of the judicial branch and not the executive branch:

j) the findings made against Partington were contrary to the evidence before the hearing.

126.  As a result of the aforementioned actions, Partington has suffered adverse and harmful deprivations, including, but not limited to, lost or jeopardized present or future employment and/or financial opportunities.

WHEREFORE Plaintiff Earle A. Partington respectfully requests that the Court enter a judgment in Partington's favor and against Houck in his capacity as Judge Advocate General and that the judgment provide the following relief:

a. a declaration that the purported suspension of Partington by NJAG  is null and void;

b. a declaration that the suspension of Partington by CAAF  is null and void;

c. a mandatory injunction directing the NJAG to set aside his purported suspension of Partington

d. a mandatory injunction directing the CAAF to set aside its suspension of Partington;

e. an injunction prohibiting the NJAG from taking further action against Partington;

f. awarding Partington his fees, costs and expenses, including reasonable attorneys' fees, relative to the vindication of his rights by the above-captioned action pursuant to, *inter alia*, the Equal Access to Justice Act, 28 U.S.C. §2412; and

g. providing such other and further relief as is necessary and just.


**Third Cause of Action**
**Administrative Review**
**5 U.S.C. §702**
**(Defendant Houck, in his capacity as Navy Judge Advocate General and the United States Court of the Appeal for the Armed Forces)**

127. Partington reavers and reasserts the allegations in paragraphs 1-126 as if fully set forth herein.

128. The decision of the NJAG was arbitrary, capricious and based upon improper interpretations of the pertinent facts and legal standards.

129.  The NJAG, as discussed infra, did not follow its own procedures as provided in, without limitation, JAGINST 5803.C1.

130. As all administrative remedies have been exhausted, the decisions of NJAG is ripe and judiciable and should be appropriately reviewed.

131.  Accordingly, the purported disciplinary actions undertaken by, NJAG and Rules Counsel shall be declared null and void.

WHEREFORE Plaintiff Earle A. Partington respectfully requests that the Court enter a judgment in Partington's favor and against Houck in his capacity as Judge Advocate General and that the judgment provide the following relief:

a. a declaration that the purported suspension of Partington by NJAG is null and void;

b. a declaration that the suspension of Partington by CAAF is null and void

c. a mandatory injunction directing the NJAG to set aside his purported suspension of Partington;

d. an injunction prohibiting the NJAG from taking further action against Partington;

e. awarding Partington his fees, costs and expenses, including reasonable attorneys' fees, relative to the vindication of his rights by the above-captioned action pursuant to, *inter alia*, the Equal Access to Justice Act, 28 U.S.C. §2412; and

f. providing such other and further relief as is necessary and just.

### Fourth  Cause of Action
#### *Bivens* Claim
#### (Defendants Houck, Porzeinski, Blazewick and Morin individually)

132. Partington reavers and reasserts the allegations in paragraphs 1-131 as if fully set forth herein.

133.  Partington has constitutionally protected rights which have knowingly been violated by the defendants.

134.  Partington lacks any statutory cause of action to provide any redress for the violations of his constitutional rights.

135.  There are no "special factors" that would justify a refusal by the court to provide a judicial cause of action and remedy.

136.  As a result of the foregoing, Partington has incurred and continues to incur, significant damages which, in part, can be remedied by monetary damages.

WHEREFORE Plaintiff Earle A. Partington respectfully requests that the Court enter a judgment in favor of Partington and against Houck, Porzienski, Blazewick, and Morin, individually, and that the judgment provide the following relief:

a. awarding Partington his actual damages incurred as a result of the violations by the defendants of his constitutional rights;

b. awarding Partington his fees, costs and expenses, including reasonable attorneys' fees, relative to the vindication of his rights by the above-captioned action pursuant to, *inter alia*, the Equal Access to Justice Act, 28 U.S.C. §2412; and

c. providing such other and further relief as is necessary and just.

## **JURY DEMAND**

Plaintiff requests a trial by jury on all issues so triable.

EARLE A. PARTINGTON, Plaintiff

By his attorneys,

Dated: November 16 2010

Judith L. Wheat, Esq. (D.C. Bar No. 431411)
Katherine Van Dyck (D.C. Bar No. 981272)
GRIFFITH WHEAT, PLLC
1050 17th Street, NW, Suite 600
Washington, DC 20036
Phone:  (202) 496-4963
Fax:  (202) 587-2980
judithwheat@griffithwheatlaw.com
kvandyck@griffithwheatlaw.conm

Jeffrey A. Denner, PHV admission to be filed
Paul J. Andrews, PHV admission to be filed
DENNER♦PELLEGRINO, LLP
Four Longfellow Place, 35th Floor
Boston, MA  02114
Phone: (617) 227-2800
Fax: (617) 973-1562
jdenner@dennerpellegrino.com
pandrews@dennerpellegrino.com